Thank you. Good morning, everyone. Good morning. As some of you know, we are part of our panel. Judge Rugi Aldershot, esteemed colleague, who is coming in via video conferencing from Santa Barbara, California, where the sun is shining unlike Philadelphia, Pennsylvania. Judge Aldershot, how are you? I'm fine. Fine. We're coming in. Yes, we're coming in clearly. I take it that you, the two of you, have had two days of sleep. Yes. Yes, indeed. Good morning. Good morning, Michael. All right, we'll call the first case, McCutcheon v. Americas Servicing in Fremont. May it please the Court, my name is David Shaw, and I represent M. Clark McCutcheon. He is the appellant and the cross appellee. I'll refer to him as the borrower. This is a case that involves a loan. It's a loan of December the 23rd, 2005, in which the borrower refinanced the mortgage on his home. His home is located at 321 South Camac Street, right here in Philadelphia, right downtown. And it's a property that, while it's a row house, fairly modest, its value has increased over the years because of its position. It's actually within walking distance of City Hall. The plaintiff, or the borrower, is an individual who is today 74 years old. He's here. And at the time of making this loan, right before Christmas in 2005, he was 71 years of age. He was retired, and his only income was Social Security and a pension, approximately $2,800 a month. Mr. McCutcheon had refinanced his home several other times, and in fact had refinanced it as early or as recently as March of 2005. So this took place about nine months thereafter. And that was significant because it entitled him to a reduced rate in his title insurance, which later on became an important issue. The way that Mr. McCutcheon got the loan is he consulted a broker. Mr. Costley, the borrower testified that he never got any papers before the loan, didn't really know what the terms were. Mr. Costley had sent him some loan papers, but they related to another loan that apparently didn't go through. As you go on with the background, Mr. Shull, may I ask you a question? Yes. I got the impression in reading the record that Mr. McCutcheon is not exactly a babe in the woods, that he has a decent education. I don't know. The record says he's a college-educated individual. I don't know if that means he has a college degree or not. But he's also a former mortgage broker. Oh, no. Is that accurate? No, he is not a mortgage broker. He worked for years for the – actually worked for the military for years, and he was in the book industry. He worked for a book dealer. He was not involved in the mortgage industry at all. All right. Why don't you correct then the impression that I have, because I read the word worked for a mortgage company or was a mortgage banker or broker or someone who initiates mortgages. I really can't say where that came from, Your Honor, but it was not true of Mr. McCutcheon. He never worked in those industries. No connection with the mortgage industry whatsoever. That is correct. In fact, he lived in this home for 50 years, and he actually wasn't told anything about the loan. The only thing that happened right before Christmas, he gets a call from a young man, he says, who says, oh, I can come over and do your loan today. So Mr. McCutcheon says, fine, come on over. The guy arrives. The man arrives. It's about 5 or 6 o'clock. Now, of course, this is around Christmas, one of the shortest days of the year. It's dark. He can't read. He has glaucoma. He doesn't have very good lighting in his home. Really can't look at the papers. Signs them. And doesn't really look at them until a few days later. And he does look at them. Then he sees that the broker. Mr. Shull, this is Judge Dillister. I want to follow through with Judge Fuentes. It seems to me that I read somewhere that he was very active and busy in the mortgage business of buying real estate and getting mortgages on it. Am I wrong? Yes, Your Honor. The only property that he's ever had mortgages on is this property. He rewrote this mortgage several times. And I don't know if that was the reference to that that Your Honor is thinking of. But Mr. McCutcheon, in fact, at the time of this hearing, he's a volunteer for his church and also for the Gideons. He gives Gideons Bibles to people. Let me follow up with Judge Aldershot's point. So that Mr. McCutcheon was not involved in the sale or purchase of real estate other than his own. That involved initiating mortgages? That is correct. The only mortgages that he's ever had in his lifetime are on this property. Your adversary can shed light on that. Page four of Fremont's brief says that Pellant was no stranger to the loan process as he had obtained no less than five mortgage loans during the four years prior to 2005. Now, is that correct or incorrect? Those are mortgages on this property. He had refinanced this property several times. Yes, he had. Five mortgages during the four years. That's a lot of mortgages. But Your Honor, you have to understand, and this is the way it used to be. It's not this way today. Brokers get somebody that they feel they can make deal after deal for and they keep contacting. Mr. Costley has contacted him since then. And again, in fact, he testified to that and said, wait, can I help you out again? You know, they're really just involved in writing these loans over and over again because they get the book every time. He'd cash out. He'd keep the property value was going up. He'd remortgage, get a little cash, pay off a couple bills. So he was familiar with this process. You'd have to acknowledge that. He knew what refinancing was, yes. I think that's probably what all of us are getting to. Okay. Well, he had done it before. But this was different than his other loans in that the payment, the monthly payment, was more than his income. And that was just in the beginning. I mean, it turned out this was a variable rate mortgage. It was going to shoot up to $4,000 a month. Was he aware of that fact? I mean, he knew what his income was and he knew what his monthly payment was going to be. He did not know what his monthly payment would be. He knew what his income would be. That's because he didn't read the papers. Well, he wasn't told anything beforehand, but he did read them several days later. He said, whoops. Okay. But you acknowledged that he had not read the papers when he started this. Right. In fact, they weren't, as far as we know, available to him until the day of settlement. All right. And they were there. There's no question the papers were there at the settlement. If he wouldn't have signed the papers, he wouldn't have a loan. Did he read them at settlement? No. He couldn't because of the lighting and the fact that he has glaucoma. And it was in the evening at a home that doesn't have very good lighting. And he testified to that. The strength of your legal argument is not dependent on whether he read the papers or not, is it? That is correct. It relies, in fact, what happened on this is actually he got about $10,000 out of it, but he used all of that to pay the mortgage. So he wasn't trying to fleece them out of the money. He just couldn't pay it after a while. He came in very shortly afterwards, only five or six months later. We rescinded the loan. We wrote a letter rescinding in May of 2006. And actually, they sent him an Act VI notice. They started a foreclosure proceeding against him. But then we filed a lawsuit. Nothing went forward on that. About a year later, the case was tried. Judge Fulham heard the case. The next day, he issued a decision. And he basically said one of our claims was correct. The title insurance was overcharged. He shouldn't have gotten the basic rate, which was $2,300. He should have gotten $1,600 or $1,700. It was overcharged by $668, and that was a disclosure violation. But where Judge Fulham drew a distinction, and I don't think it turned out to be correct in this case, was the tolerance for a disclosure violation is only $100. He said, well, it's $668. That's enough for a disclosure violation, but it's not enough for allowing rescission. You have to have a half of a percent of the loan balance, which was about $2,000. And the overage that he found was only $668, I think it was, and therefore it wasn't enough. It wasn't just Judge Fulham applying existing law. Well, he was applying certainly what he believed to be the correct law. But I don't think it was correct for a number of reasons. Number one, he was allowing only the excess of the title insurance to be considered something that should have been in the finance charge. What the regs say is they say if you charge something that's a reasonably charged item, and it's something like title insurance, it's one of the examples, it does not have to be in the finance charge. But there's nothing in the regulations that says if it's over that, you only have to charge the excess. It was an unreasonable charge. Isn't that precisely what truth in lending requires, that the excess be considered, not the entire amount? No, sir. There's absolutely nothing in the regulations that says when you find that there's an overcharge, you only charge the overcharge as a finance charge. Doesn't Section 1605 require that there be a $100 tolerance and rescission only applies for amounts just over $2,000? Well, it's not $2,000. It's one-half of 1%, which would have been $2,000 in this case. But in this case, Your Honor, if he would have found that the entire title insurance charge, all of which was unreasonable, was part of the finance charge, it would have been over the tolerance because it was $2,300 for the price of the title insurance. That's one of the problems. Did our court in the case of Sturton v. Option 1 Mortgage, a case that you should know because you were an attorney. Yes. Didn't our court hold against Sturton on a virtually similar, identical issue as you're arguing here today? No. What happened in Sturton, it didn't happen here, is the defendant didn't even raise the issue at all, never mentioned the tolerance. Actually, the bankruptcy court, when I went back and asked for reconsideration, said, you know what, you're right. Plaintiff wins. But it was reversed by the district court and this court, which said it isn't really an affirmative defense. But there was nothing in Sturton about how you compute. In that case, it was only $57. It was a teeny little bit. It really wasn't anywhere close to what the range would have been. In this case, several hundred dollars. The other issue, though, is whether the tolerance gives a tolerance for every kind of overcharge. The Sixth Circuit in the Inge case says that it's Can we go back to Sturton for one second? Yes. Because I know that Judge Ambrose did notice that there was a $25, I think, inappropriate markup of an appraisal fee. That was one of the things. It was that and there was an appraisal fee and I think there was some other fee that was also marked up. But he did say that the entire appraisal fee did not need to be disclosed as a finance charge, which seems to undercut your argument that the entire amount of the title fee has to be disclosed. Well, I think it's somewhat different because I think you could distinguish the appraisal from the markup. They were really two different things. If we'd have been saying the appraisal was unreasonably charged. The appraisal is in excess of the appropriate appraisal fee. Well, what the court actually found is that it was the bankruptcy court found that it was a markup of the appraisal. It wasn't charged by the appraiser. It was charged by the broker was adding that on to the appraisal. It really wasn't part of the appraisal at all. He just stuck it on the settlement sheet as an extra charge. He had to admit it. Mr. Shull, Judge Alderson here. I'm going to ask you if the statement that I read is true. Courts that have reached the issue hold only that the amount over an otherwise reasonable title insurance charge is subject to inclusion in finance charge calculations. Is that a great statement? There certainly are courts that have so held, Your Honor. Johnson being one in this district. There are several cases from the Northern District of Illinois. There aren't a whole lot of them. I would say four or five of them. And it is true that that's what they held. But I don't think they're correct. How about the other cases? How about cases that your statement assumes that we have other cases going the other way? I do not have a case going the other way, Your Honor. But I'm hoping that what this court will do is read the statute and the legs and decide that, in fact, that's how it should be read. And doing that will be contrary to the general number of cases that do not go the other way. There are more cases, certainly, Your Honor, you're correct, that go against me on this issue than go for me. You are correct. And I don't mean to state to the contrary. Let me ask you another question. Excuse me, Judge. I just want to know how long was the argument in this case? Excuse me, how long? Do I have left? This is directed to the judges. Fifteen minutes aside. Yes, it's fifteen minutes aside, Your Honor. Actually, my time's out. I felt that there was an awful lot of time being spent on an argument that I really did not think is my good case on that issue. So then we have some other issues. There is another issue, Your Honor, that's very important. And that is the issue of the disclosure of the variable rate feature of this loan, which has to be provided prior to settlement. Did you reserve time for rebuttal? I did. How much time did you reserve? Three minutes. All right. Why don't you bring that issue up in rebuttal? I will. Thank you, Your Honor. Thank you. Ms. Feltz? Good morning. May it please the Court, my name is Sandy Feltz, and I represent Fremont Investment and Loan, which is an appellee as well as a cross-appellant in this matter. I will be taking ten minutes for my argument, and Ms. Ann Walters, who represents Appellee America Servicing, will take five minutes for her argument. Ms. Feltz, before you get started, let me ask you a question. It appears in your answer on behalf of Fremont, you brought a cross-claim for indemnification and contribution against United Home Savings. Yes. The record doesn't show, at least I can't find it, that that cross-claim was disposed of. Do you know what the ultimate disposition of it was, and was it ever disposed of? I believe it was disposed of, Your Honor, because we were not able to effect service upon United with our answer and cross-claim. Okay. And you believe the record shows that? I believe that it was dismissed for lack of prosecution. You believe what? It was dismissed for lack of prosecution because we could not serve United. Okay. All right. Maybe you can clarify the question of the background of the mortgagor in this case. Certainly, Your Honor. This is an interesting case in terms of the background. I'm going to just address it very briefly. Mr. McCutcheon, as indicated in our brief, was a serial mortgage borrower. He had a property which was inherited from his family, and he then did what some borrowers apparently did during the 80s and 90s. He took out loans which provided cash out to him. He then used the cash out to pay his mortgage payments. And when that cash ran out, he took another loan, and then another loan, and then another loan. In this particular case, Mr. McCutcheon took out five loans in four years, and the fifth of those loans, Your Honors, was the Fremont loan. And Mr. McCutcheon has admitted that in each case, the purpose of the refinancing was to take cash out so he could make his mortgage payments. And that was also the purpose of this particular mortgage that's at issue. And therefore, it's our position that he was very familiar with the loan process and with the standardized loan documents that were put before him, both with regard to the Fremont mortgage and the other four mortgages that he had in the short period before that. You know, it does seem like Mr. McCutcheon was fighting a good fight. I mean, you know, the overcharges can sometimes fly under radar, so he's raising a very good point. Can't mortgagors stop lenders engaging in patterns of overcharges like this? Well, Your Honor, we would disagree that there is a pattern of overcharge here. There was an overcharge here. There was an overcharge here. There's no evidence that there was a pattern or practice of the lender or the broker or anybody else for charging in excess of the amount that should have been charged for title insurance. There's no evidence that Mr. McCutcheon was induced or convinced or somehow fraudulently caused to enter into this mortgage loan. Mr. McCutcheon testified both at trial and at his deposition in this case that he voluntarily and knowingly entered into all of these mortgage loan transactions for the purpose of getting cash out so he could stay in his house over and over again while really funding his lifestyle and funding his residence in the property despite his lack of income. Interestingly, Your Honors, Mr. McCutcheon has also admitted both at the trial and in his deposition that he was aware that he could not make those mortgage payments, that his income was less than those mortgage payments, and that his income on the loan applications was fraudulent, and yet he signed the loan applications. Now, that's not relevant. I would imagine that the lender was aware that he couldn't make those mortgage payments. Well, Your Honors, Mr. McCutcheon certified under penalty of perjury in the loan application and in a handwritten stated income letter that his income was in far excess of what it actually was, and therefore the lender had no way of knowing that Mr. McCutcheon, in fact, did not earn the amount that he so represented to the lender. I'm straying you from the real issue in the case. There are several, but the important one is a request for rescission, and should the entire amount of the title fee be included as a service charge? Yes, Your Honor, and that's an important issue. As this Court is aware, the district court in the Eastern District of Pennsylvania has ruled on this in the Johnson case, the Strong case, Oscar, and most recently in the Madera v. Ameriquest Mortgage Company. That was Judge Gardner, and Mr. Scholl and I were on opposite ends in that case as well. The analysis is this. Where there is a title insurance charge, under normal circumstances, that is expressly excluded under the Truth in Lending Act from being included in the finance charge because it is not considered a cost of credit. Only where that cost of credit exceeds the reasonable amount is that portion, the excess portion, to be included in the finance charge. And, Your Honors, this is why it makes sense. It makes sense under the tolerance for accuracy provisions, and Judge Van Antwerpen addressed this issue. I believe this Court, in fact, addressed the issue in the Sturton case, the issue of excess versus the entire amount. And that's this, that if there is some discrepancy and the entire amount, both the reasonable and the unreasonable portion, are to be included in the finance charge, then it puts us under the purpose of the tolerance for accuracy provision that was placed into the Truth in Lending Act by Congress in the 1995 amendments. For instance, in this case, we have a $668 discrepancy. But under the appellant's argument, if there was a $1 discrepancy, the appellants would argue that the entire amount should be included in the finance charge, therefore creating a violation of the Truth in Lending Act, an inaccurate disclosure. And clearly, Congress intended by putting in the tolerance for accuracy provisions, they wanted to prevent creditors from being liable for insubstantial disclosure discrepancies. And they defined insubstantial disclosure discrepancies as those less than one-half of 1% of the loan amount. Judge Fulham then was right that under 1605, only the excess of $668 had to be listed as a finance charge. That's correct, Your Honor. And that is supported by all of the case law in the Eastern District, including Johnson, Strong, Oscar, and again, Your Honors, by Judge Gardner in the Madera case just a few months ago. Is the judge open to damages or is it just a matter of restitution? You just get your money back or? Under the Truth in Lending Act, if there is, if rescission is allowed, the lien is removed from the property and the borrower is entitled to certain damages. But this is not a case for rescission unless we agree with Mr. Shull. That's correct. There is no rescission if the disclosures are accurate, and it's our position that the disclosures are accurate as a matter of law because the discrepancy is within the tolerance for accuracy. Your Honor, I just want to briefly mention. Would you explain that last sentence to me again, please? Yes. When Congress placed the Tolerance for Accuracy provisions into the Truth in Lending Act in 1995, what they said was that a disclosure shall be treated as accurate if the finance charge disclosed does not vary from the actual finance charge by more than one-half of one percent of the total amount of credit extended. And I'm citing, Your Honor, 1605F2A. And therefore, the court must, under the 1605F, must deem as accurate any finance charge if the amount of disclosed is less than one-half of one percent of the loan amount, which it is under these circumstances. And therefore, the finance charge disclosed to Mr. McCutcheon was accurate. I want to ask you about the, you're challenging also the attorney's fees. We are challenging the attorney's fees. What's the, I know you state in your, you're basically arguing the amount of the attorney's fees. Did, in your opinion, was it appropriate for the district court to merely find an amount without explaining why they found the amount? It is, it is inappropriate because under the Third Circuit's decision in Payne v. Equicredit, and under the Lodestar analysis, there must be some analysis by the court in determining whether the amount of the attorney's fees and costs that have been asserted are reasonable. Isn't it, is it sufficient here, or is it, let me phrase it in reverse. Isn't it sufficient here that you had the two posts? You had the plaintiff asking for about $14,000, and you were arguing that the amount should have been somewhere between $4,000 or $6,000. Is it acceptable for the court to pick a number in between? I don't know whether the court did that, did an analysis, Your Honor, and I think that it's necessary for the district court to do an analysis rather than to pick a number somewhere in between. For purposes of settlement, maybe a number in between would have been appropriate. But for purposes of doing a Lodestar analysis and an analysis under the Payne v. Equicredit case, the court really needs to make a determination of whether the fees are reasonable in light of the claims that have been successful against that particular defendant against whom the attorney's fees and costs are asserted. But didn't Mr. Shull submit the hours that he worked and the kind of work that he did for the plaintiff, and there was no objection? There was no objection to the amount of the hours expended or Mr. Shull's hourly rate. What was objected to were the attorney's fees and costs incurred in connection with the plaintiff's claims against other defendants, ASC and United, those attorney's fees and costs which were incurred in connection with claims that were unsuccessful. Let me then read you a statement, as Judge Aldersert did, and you can tell me whether you agree or disagree with it. This is from the case of West Virginia Hospitals v. Casey. We said that mathematically deducting fees proportional to a plaintiff's losing claims is too simple and unrealistic. What's wrong with that? It is, Your Honor, there's nothing wrong with that statement whatsoever. Isn't that what you're asking us to do, though? Well, in fact, it's not just a generalized calculation. For instance, if I had, if we had requested that the court take the total amount and divide it by one-third, irrespective of the claims and the costs that were incurred, that would be one thing. In fact, Fremont has done a detailed analysis, itemized analysis, to determine which costs and claims are directed to other parties, which costs and claims are directed to the losing claims, and that is a more specific analysis. It's contained in our brief, and that's the appropriate analysis under the Payne case as well as subsequent cases. Would the panel, my time is up, but would the panel like me to address the variable rate disclosure issue at this point? No, I don't think so. Judge Alnicert, any further questions? I would just like for you to comment on how you see Act 91 fitting into this problem. Yes, Your Honor. The appellant's argument is that the tolerance provisions under the Truth in Lending Act are twofold. There is a one-half of one percent tolerance under normal circumstances, and if a foreclosure action has been initiated, the tolerance decreases to $35. It is the appellant's position, as interestingly Mr. Scholl's position was in the Sturton case, that the mailing of an Act 91 notice, which is a notice of intent to foreclose, is the initiation equal to the initiation of a foreclosure action, and therefore the tolerance decreases to $35. And the corollary to that in the appellant's mind is that therefore the discrepancy is in excess of the tolerance and they are entitled to rescission under the Truth in Lending Act. I think it's very clear that the intention to institute a foreclosure is not the institution of a foreclosure action, as indicated in Regulation Z226.23H2. The plain language contained on an Act 91 notice says that the lender intends to foreclose, and it warns that unless payment is made within 30 days, the lender intends to instruct its attorneys to start legal action to foreclose upon the mortgage property. That's from the Act 91 notice that Mr. McCutcheon got in this case. That was not an institution of a mortgage foreclosure action, but an intent to institute, and therefore the $35 tolerance is not triggered in this case. Ms. Feltes, thank you very much. Thank you. Ms. Walters. Thank you. Good afternoon. May it please the Court, Ann Walters for the Appellee America Servicing Company. Your Honors, my client is merely the servicer of this loan and has been the servicer since June 1 of 2006. And as the servicer, the Truth in Lending Act is very clear that they can only be liable for any alleged violations if they are apparent on the face of the loan documents. And when ASC obtained the loan documents, they obtained a signed Truth in Lending disclosure form, a signed variable rate note, a mortgage. They examined them, found no irregularities. And, in fact, Judge Fulham correctly found no irregularities on the face of these documents. And pursuant to the Truth in Lending Act, as the assignee of this loan, they can only be liable for any violations on their face pursuant to 15 U.S.C. section 1641. So there were no violations of that. I don't know if Your Honors would like me to further address the title insurance issue. And as far as the Act 91, Judge Aldisert, this statute itself states that no foreclosure or any legal proceeding may take place until the Act 91 notice is sent out. So clearly the reading of the statute would indicate that that is not a foreclosure. That's not the initiation of a foreclosure. There's no evidence that a foreclosure was ever instituted by America Servicing Company in this matter. They merely sent out one Act 91 notice in July of 2006, never followed up with that, and no complaint summons was ever filed in either federal or state court. So it's my argument that essentially when they received the documents as the servicer, there were no irregularities on the loan documents, and they cannot be held liable under any of the appellant's theories in this matter. Thank you, Ms. Walters. Thank you. Mr. Scholl? I'll devote most of my time to the variable rate issue, which you invited me to bring up at this point. I just say this. Can I touch, Mr. Scholl, also briefly on the attorney fees issue and whether there's a basis for that to be affirmed? Okay, yeah. As I read Ms. Felder's argument, she is doing exactly that. She's saying, well, if you spent, if you argued against three parties, you divide it by three. If you argued against two parties, you divide it by two. But I would have had to spent that time anyway. If I had just sued Fremont, I would have had to spend that time. So I don't see how she figures that. What about the argument that the district court did not explain its selection of $10,000 as the amount? Well, there wasn't much explanation. I agree. But I guess it's just a question of how much you'd require. It's in between. I mean, Judge Fulham, I think, wanted to get it decided quickly, and he was very quick. And, you know, he just issued the order. I don't want to say that's Judge Fulham. I mean, but I, you know, I saw it, and I thought, well, you know, I would have liked more, but I guess they would have liked less, and I thought it was fair. Though they're bankrupt, and I'll probably never collect it, but Fremont is bankrupt now. But the variable rate disclosure, very interesting. What the law requires is usually you don't have to give disclosures before settlement, but a variable rate disclosure you do have to give before settlement. And the testimony of Mr. McCutcheon time after time is, I didn't get anything other than something from some other lender. I never got anything about this loan. Now, if you read their briefs, you'd think there was some evidence on that issue, because they keep saying that Judge Fulham found that. But what did Judge Fulham actually find on page four about this issue? He says, Plaintiff's other claims also claim that truth in lending violation concerns variable rate disclosures and whether the plaintiff received these in timely fashion. Plaintiff has not met his burden on this claim, semicolon. There is no dispute that he received the required disclosures. Well, he had to get them in the note, because they wouldn't even have had a variable rate. They weren't in the note. And Plaintiff acknowledges that he did not read the relevant documents until sometime after the closing. Well, it doesn't matter when he read them. The point is he had to get them beforehand. If he got them beforehand, he might have read them. He would have had some time when it would have been relevant. Didn't the Fremont present evidence that the actual documents were presented at the time that the loan was signed? Well, in sufficient evidence, they called somebody who was in California saying, our office in Florida sent this to him. And they had a letter that supposedly was sent to him. Of course, Mr. McCutcheon testified he never got it. And to me, that is not evidence. They would have had to show something under the Hagner case. There's a presumption that mail is received. But there was not even anybody from the office that sent it out there. Nobody else, other than the country. Doesn't that turn this into a factual dispute that the trial judge decided? It might be, but Judge Fulham didn't decide it. He never says that Mr. McCutcheon got disclosures before settlement. I just read the only passages that he says on this subject. And he didn't find that. What did your client say, however? Didn't he make a statement to the contrary that he did not receive it? Not contrary to that he didn't receive it. He said numerous times he got nothing about this loan prior to December the 23rd. When he appeared and they did give him the papers after the settlement. But there was no statement by my client ever that he got disclosures before December the 23rd. The letter that they had was dated December 20th. But, again, it was sent from Florida. There's never been any testimony that he got it. And what the commentary says is failure to inform the consumer of the existence of a variable rate feature is a material disclosure violation. Material disclosure violation, right to rescind. And, incidentally, it would run against America's servicing right. A rescission runs against them whether they knew about it or not. A rescission goes with whoever has the note. So the argument that they couldn't have observed it on the face might have some validity in the disclosure, but it does not have any validity in the rescission. Thank you, Mr. Troll. And thanks to all counsel for the very well presented arguments. We'll take the case under advisement. Thank you.